No. 2309
Second Circuit Appeal

---

## LONNIE W. THOMPSON v. LOUISIANA CENTRAL LUMBER COMPANY

---

(May 9, 1925, Opinion and Decree.)

(June 23, 1925, Rehearing Refused.)

(October 6, 1925, Writ of Certiorari to Supreme Court Refused.)

---

(*Syllabus by the Editor.*)

1. **Louisiana Digest—Master and Servant —Par. 160 (b).**

In view of the Workmen's Compensation Act No. 20 of 1914, excess payments of more than allowed under the act for hospital and medical services made by defendant for the injured employee cannot be deducted from the compensation due to the employee without the latter's consent.

2. **Louisiana Digest—Minors—Par. 4, 12.**

A minor injured in an accident and placed in a hospital by his employer cannot contract to pay for the hospital bills in excess of the amount allowed under the Workmen's Compensation Act No. 20 of 1914.

3. **Louisiana Digest—Master and Servant —Par. 159, 159 (a).**

An injured employee whose injury eventually caused the amputation of his leg above the knee, upon being shown to be totally disabled will be allowed compensation under Workmen's Compensation Act No. 20 of 1914, Par. 8, Subsection 1 (b) for full compensation during the disability, not exceeding 400 weeks.

(ON APPLICATION FOR A REHEARING)

4. **Louisiana Digest—Master and Servant —Par. 160 (j).**

The evidence clearly shows that plaintiff, the injured employee, did not contract to pay medical and hospital bills over the maximum allowed by the Workmen's Compensation Act No. 20 of 1914.

5. **Louisiana Digest—Master and Servant— Par. 154.**

Section 3, Subsection 6 of the Workmen's Compensation Act No. 20 of 1914 does not go to the extent of giving to minors the right to enter into a contract not expressly contemplated by the Workmen's Compensation Act (Article 1782 of the Civil Code).

Appeal from the Thirteenth Judicial District Court of Louisiana, Parish of Caldwell. Hon. F. E. Jones, Judge.

This is a suit brought by an injured employee for compensation under the Workmen's Compensation Act for total disability due to the amputation of his leg above the knee.

There was judgment for plaintiff and both plaintiff and defendant appealed.

Judgment amended and affirmed.

Julius T. Long, of Shreveport, attorney for plaintiff, appellant.

Thornton, Gist & Ritchie, of Alexandria, attorneys for defendant, appellant.

CARVER, J. This is a suit under the workmen's compensation act. Both parties appeal from a judgment awarding plaintiff $14.40 per week for 175 weeks and during disability, not exceeding 225 additional weeks, less $210.00 deducted from the first amounts due, and less an additional $1151.00 to be paid by deducting the amount of compensation due at the time of the judgment and the balance by deducting 50% of the weekly compensation allowed until paid.

The proof shows that on October 23, 1923, the plaintiff then 19 years old, while working for defendant as a "swamper" clearing roads for its log wagons, accidently cut his left leg just above the knee. Defendant had him placed in the St. Francis Sanitarium at Monroe and his wound treated by Doctors Beetle and Bendell. They tried to save the leg, but it had become badly infected and on or about December 25, 1923, they amputated it just above the knee.

He remained at the Sanitarium until about January 29, 1924, when his uncle, John A. Moore, who had partially raised him and who stood to him as a parent, his father and mother both having died, when he was quite young, took him over the objection of defendant to Shreveport. Moore tried to place him in the Charity Hospital, but that institution refused to receive him because he was entitled to compensation from his employer.

Thereupon Moore telephoned to the office of defendant at Clark's, Louisiana, he says he recived no satisfaction at this place, whereupon he called up the head man of defendant at Pineville or Alexandria and was told to carry him to Schumpert Sanitarium, which was done. His condition on arrival there is described by Dr. Willis as follows:

"Yes, I first saw him on January 29, 1924. He came into the Sanitarium very emaciated, had bed sores over his back and both hips as big as saucers and the left leg was amputated above the knee. General condition very good."

He further stated (page 14) that there were three large sores about the size of a round saucer with the bone exposed in the center from both hips and the sacrum and back bone.

And further, (page 15) "He was so emaciated you could easily lift him with both hands".

He remained in the Schumpert Sanitarium until September 19, 1924, when he was discharged.

Dr. Willis says (page 11):

"His condition on discharge was that the stump of his left leg was healed, his general condition was good. We considered him in good shape and expected him to make a good recovery in about three or four months, of course, with the loss of the leg."

"Q. Had the toxins due to the infection entirely disappeared when he was discharged?

"A. Yes."

He further gave it as his opinion that after three or four months from the time of discharge he would be all right, except for the loss of the leg.

While in the Schumpert Sanitarium his leg was reamputated near the hip; Dr. Willis stating that this was necessary because the bone was protruding beyond the muscle and skin tissue.

On January 10, 1925, Doctors E. L. Sanderson, S. C. Barrow and O. C. Rigby gave testimony, they having examined him December 31, 1924. Dr. Barrow had taken x-ray pictures of his right knee joint and stated that it was affected with arthritis; that the cartilage had become partly absorbed; and there was inflamation of the parenthymatous membrane; all of which thought was caused by general infection of the system.

Dr. Rigby testified, page 22:

"On physical examination he looked somewhat emaciated and extremely weak. His pulse was one hundred and forty and his temperature was one hundred. His respiration was about twenty. The left leg is amputated at the junction of the middle upper third of the fema. The right leg shows some atrophy of the muscles of the knee joint with some contraction of the flexor muscles and tenons of the knee. The foot is bluish in color, and cold, due to poor circulation. The lungs, on examination with a stethescope, did not reveal any rels or anything that might lead you to suspect tuberculosis. The heart does not seem to be enlarged but is very rapid. His general appearance is that of a disease of infection of some kind in which it has gone all over the body, but must have been absorbed up. The x-ray which was taken of the knee joint shows chronic arthritis, with an absorbtion of the cartilage in the knee."

He further testified, page 24:

"I think his knee will always be impaired, and it is probable that he otherwise may be impaired from the standpoint of his heart and lungs."

He further testified page 25:

"I don't believe he will ever be able to do manual labor any more."

Dr. Sanderson testified, page 30:

"Well, I am convinced that this man having gone through a long period of septic infection, that all the tissues in his body were infected and naturally the larger joints in your body suffer from general septic poisoning more so than the other parts. I don't say that they suffer more, but their function is more impaired because of their greater importance. I think when this man got out of bed and began to walk that his knee joint had been so affected that the pressure necessary to carry the whole weight of his body, even if that knee were normal, was too great, and it produced a hypo-atrophy of the tissues around the joint, that is, there was some enlargement, nature trying to make it stronger with absorption of the cartilage that lined the joint. I think the absorption the x-ray shows took place after the man got up his weight bearing in the knee joint twice as much as the knee was accustomed to carrying and that the cartilage was diseased and they would not stand the bearing, and that cartilage was ab-

sorbed, leaving the bone practically without any bearing."

Further, on page 32:

"I think he is totally disabled and permanently disabled."

At the time of the trial, Dr. Hines examined the plaintiff at defendant's request but was not asked to testify.

While in the Schumpert Sanitarium plaintiff's right leg had become crooked and an effort was made to straighten it by the use of a plaster of paris cast. This effort, though, was unsuccessful as the leg became crooked again soon after taking the cast off and at the time of trial was still crooked to the extent of about six inches.

Plaintiff testified that he had made efforts by the help of school children and others to straighten the leg but could not do it and could not bear his weight on it without crutches. He further said that he was subject to falling and that he had chills when he ate anything hard to digest. Also that while his normal weight was 172 pounds that he then weighed only a little over 100. And further, that he had been very much more emaciated but had gained in weight until about six weeks before the trial, which was on January 15, 1925, at which time he had ceased to gain.

The evidence satisfies us that plaintiff's condition is one of total and permanent disability.

Plaintiff alleges and swears that his wages at the time of the accident were $3.50 a day and board.

Rosser, the contractor under defendant for whom plaintiff worked testified that it was $3.00 a day and board.

As to board, the proof shows that at the regular boarding house the charge is $1.00 a day. Rosser says, though, that he intended boarding plaintiff at his own residence and figured that the additional cost, besides the expense of his own family, would be only 50 or 60 cents a day. However, his family was absent at the time and he placed plaintiff at one Bill Jordan's without making any arrangement as to the expenses for plaintiff's board, but after the accident settled with him for 75 cents per day .

The District Judge figured the wages at $4.00 a day including board but wrote no opinion showing how he arrived at it, and counsel for plaintiff and defendant disagree as to how it was arrived at. Plaintiff's counsel says that he figured $3.50 a day, plus 50 cents for board. Defendant's counsel say he figured $3.00 a day plus $1.00 for board.

Besides the above testimony of plaintiff and Rosser, we quote the following:

Rosser, page 132:

"Q. What was the usual and customary price paid for swamping?
"A. $2.75.
"Q. And the man board himself?
"A. Yes, sir."

Plaintiff and Rosser both testify that formerly plaintiff had worked as swamper for Mr. Griggs and plaintiff admits (page 133) that he was getting from Griggs for the swamping job $2.75 He does not say whether he got board in addition or not. On being asked if $2.75 was the regular price for swamping, he answered, "No, sir, $3.50 is the regular price for contractors to pay".

Under this evidence we think that the proper amount to figure as plaintiff's wages, besides the board, is $3.00 a day.

As to board, we think 75 cents a day, the amount paid Jordan, the proper amount to fix.

Plaintiff, though, was to receive seven days a week board which would be $5.25 a week. This divided by six, the number of days worked, would make 87-1/2 cents per day. So his entire wages would be

$3.87-1/2 a day, or $23.25 per week. Sixty per cent of this would be $13.95 per week.

The main dispute in the case is over the allowance made by the District Judge of $1,151.00 excess expenses incurred' for hospital and medical bills over and above the $250.00 which the statute requires defendant to pay.

C. B. White, cashier of defendant, testified that $1,401.00 was paid as follows:

| | |
|---|---:|
| March 28, 1924. Drs. Beetle & Bendell | $200.00 |
| March 15, 1924. Drs. Willis, Knighton, Garrett & Willis | 150.00 |
| June 1, 1924. St. Francis Sanitarium. | 302.50 |
| Schumpert Sanitarium, as follows: | |
| March 28, 1924 | 182.50 |
| May 2, 1924 | 177.50 |
| November 15,1924 | 388.50 |
| Total | $1,401.00 |
| Less statutory liability of defendant | 250.00 |
| Leaving excess payment | $1,151.00 |

As stated above, the District Judge allowed this excess.

These charges do not appear to us unreasonable. Plaintiff stayed in the St. Francis Sanitarium from October 27, 1923, to January 28, 1924, a little over three month. Drs. Beetle & Rendell treated him during this time and amputated his leg. He stayed in the Schumpert Sanitarium from January 29, 1924, to September 29, 1924, eight months Dr. Willis treated him during this time and reamputated his leg. Of course the Sanitarium services included medicines, surgical dressings, services of nurses, and also sustenance.

Anticipating that plaintiff would need excess medical and hospital services, the insurer of defendant undertook to make an arrangement with plaintiff and his uncle and also his cousin providing for such services be furnished and taken out of his compensation as advance payments thereon.

J. F. Bolton, an agent of the insurer, went to see plaintiff while he was at the St. Francis Sanitarium, on January 3, 1921, and says he explained to plaintiff and also to plaintiff's cousin what was desired. He left with them a printed blank containing a request for such excess services if necessary and an agreement that they be charged as advance payments on the compensation. This printed blank came back to defendant by mail signed with plaintiff's name and attested by W. S. Moore, his cousin, the date having been filed in January 5th. We are satisfied that defendant and its insurer believed this instrument to have been signed by Thompson himself, but we are satisfied it was not signed by him but his cousin, Moore. It is so testified by Moore, and besides the record contains considerable writing of plaintiff's, including his signature which is materially different from the signature to this instrument.

Moore further testifies that Bolton tried to explain about this paper to plaintiff but that he was unconscious, and that Bolton then tried to explain it to him, Moore, but that he did not know what he did explain.

The record contains receipts purporting to be signed by L. W. Thompson as follows:

January 30, 1924, for compensation 26 October, 1923, to December, 1923, $75.60.

January 30, 1924, for compensation 8 December, 1923, to 21 December, 1923, $25.20

January 30, 1924, for compensation December 22, 1923, to January 19, 1924, $50.40.

January 30, 1924, for compensation 21st, January, 1924, to February 2, 1924, $25.20.

These are signed L. W. Thompson, Quitman, Louisiana. It will be noted they all bear the same date. Also that this was

the day after Thompson had been removed from St. Francis Sanitarium to Schumpert Sanitarium.

J. A. Moore, plaintiff's uncle, lived at Quitman and these receipts are all attested by him.

Plaintiff testifies that he did not sign any of these receipts and we are satisfied that he did not.

Other receipts were filed as follows:

April 9, 1924, for compensation February 4, 1924, to March 1, 1924, $50.40

April 9, 1924, for compensation March 3, 1924, to March 29, 1924, $50.40.

April 26, 1924, for compensation March 31, 1924 to April 26, 1924, $50.40.

August 1, 1924, for compensation June 23, 1924, to July 21, 1924, $50.40.

These receipts were intended by defendant to show payments on account of the Sanitarium and medical bills as well as what was paid to plaintiff himself.

Plaintiff admits signing those covering 4th of February to 1st of March, 31st of March to 16th of April, and 23rd of June to 21st of July. He was not asked about the one from 3rd of March to 29th of March, but comparison of signatures convinces us that he signed this also.

Plaintiff testifies that he did not sign the printed blank as to excess medical and hospital services and that he never did understand it, or know what arrangement had been made about his compensation. Several letters written by him are in the record. These letters express thanks and appreciation for the kindness of defendant towards him but they also show, we think, he did not understand the arrangement about excess services. In one, of July 31, 1924, he says: "But please tell me why $50 is this receipt when I did not get the full amount". On July 30, 1924, he wrote: "Will you also tell me how much insurance I am supposed to draw, what kind of arrangement did Moore make when he came down there. He has not told me anything I suppose he wants to tend to everything".

We are satisfied that plaintiff's uncle and nephew understood the substance of the agreement evidenced by the written instrument to which plaintiff's cousin signed plaintiff's name. We are satisfied also that though plaintiff did not know exactly what arrangement had been made about the excess services, yet he knew that some arrangement had been made and at the time had no objection to it, trusting to their having made a beneficial arrangement.

"All that man hath will he give for his life."

We are satisfied, too, that defendant and his insurer believed in good faith that plaintiff had signed the printed instrument. We are also satisfied that defendant or its insurer for its account did make the expenditures claimed and that they did save plaintiff's life.

For these reasons we regret that we cannot see any legal way to allow these expenses. In our opinion plaintiff is responsible for them under article 2295, et seq. of the Civil Code under the head of "Quasi Contract".

Article 2299 reads:

"Equity obliges the owner, whose business has been well managed, to comply with the engagements contracted by the manager, in his name; to indemnify the manager in all the personal engagements he has contracted and to reimburse him all useful and necessary expenses."

Article 2300:

"All persons, such even as are incapable of consent, may, by the quasi contract, resulting from the act of a third person, become either the object or the subject of an obligation; because the use of reason, although necessary on the part of the person whose act forms the quasi contract, is not requisite in those by whom, or in whose favor, the obligations resulting from the act, are contracted."

Plaintiff's father and mother were dead, and his uncle admits (page 94) that he could not take care of him.

Whether the arrangement for medical and hospital treatment was made on request of the uncle and nephew or by de- we are satisfied that these services saved fendant or its insurer of their own volition, plaintiff's life and that therefore he is responsible for the expense under Articles 2299 and 2300.

It was squarely held, though, by the Supreme Court in Delany vs. Ferd Brenner Lumber Co., 154 La. 156, 97 South. 349, and Quave vs. Lott-Batson Lumber Co., 151 La. 1052, 92 South. 678, that excess payments for hospital and medical services could not be deducted by the employer from the compensation due the employee without the latter's consent.

We do not understand these decisions to hold that the employee is not responsible for these charges where they inure to his benefit. In either one of these cases are the circumstances mentioned, so as to show whether the expenditures were judicious and beneficial or not; but the decisions do squarely hold that without the employee's consent the excess charges cannot be taken out of his compensation.

In this case we do not believe the plaintiff did consent and we are cited to no law by virtue of which his consent if it had been given, would have been valid he being a minor.

It is decreed that the judgment of the lower court be amended in the following respects:

First: By reducing the weekly compensation allowed to plaintiff from $14.40 per week to $13.95 per week.

Second: By disallowing the $1,151.00 allowed to defendant for excess medical and hospital services.

And as thus amended, said judgment is affirmed.

## ON APPLICATION FOR REHEARING

Defendant, Louisiana Central Lumber Company, in an application for rehearing, urges that the judgment herein rendered is incorrect:

1. In holding that the evidence did not show that plaintiff consented to the deduction of the excess medical and hospital bills from his compensation.

2. In holding that plaintiff was incapacitated to contract as to the excess medical and hospital bills because he was under the age of 21 years.

3. In holding that the letters of plaintiff did not indicate that he understood and agreed that the excess medical and hospital bills should come out of his compensation.

4. In holding that plaintiff was entitled to full compensation during disability, not exceeding 400 weeks.

### OPINION.

On the first point in defendant's application, that the evidence shows consent on the part of plaintiff that the excess medical and hospital bills over $250 should be paid out of his compensation.

Lonnie W. Thompson testified, page 8:

"Q. Now, were you entirely at yourself during the time you were at the Sanitarium, and if not, how were you?
"A. I was unconscious, most of the time I was at the St. Francis Sanitarium."

(Page 29):

"Q. Do you remember Mr. Bolton coming up there to see you about the first of January?
"A. I remember some man coming up there.
"Q. You remember him explaining to you that the company was only liable for medical and hospital expenses up to $250.00 and anything over that would be considered excess medical fees and would have to come out of your compensation, don't you?
"A. I remember a man coming up there with some papers.

"Q. You remember him saying something to you about the papers having to be signed?

"A. No, sir.

"Q. You don't remember anything about that?

"A. No, sir."

John A. Moore testified, page 25:

"Q. At that time Mr. Bolton explained to you in the presence of your cousin, Lonnie W. Thompson, and to him that the company was only liable for $250.00 medical and hospital fees, and any more than that paid out would have to come out of your cousin's compensation, didn't he?

"A He tried to explain to my cousin but he was unconscious and then he tried to explain it to me, but I don't know what he did explain."

(Page 27):

"Q. You know that you were very anxious to save his life and you knew that he was very anxious to get well, didn't you?

"A. I don't know that he knew because he was unconscious.

"Q. He wasn't unconscious at the time Mr. Bolton was there, was he?

"A. Yes, sir."

J. P. Bolton a witness for the Southern Casualty Company, the company carrying the insurance in this case, testified, page 35:

"Q. Please state whether or not the plaintiff, Lonnie W. Thompson, was conscious at that time and took part in the conversation?

"A. As far as I could see he was—he talked to me."

(Page 36):

"Q. The plaintiff was in a bad condition at that time?

"A. He looked thin and in very bad condition to me."

It is to be observed that Mr Bolton does not say that Lonnie W. Thompson was conscious—he says—"so far as I could see he was—he talked to me".

This testimony, we do not think, overcomes the positive testimony of Lonnie W. Thompson and John A. Moore that plaintiff was in a state of mind entirely beyond the ability to make a contract or waive any of his rights.

The testimony as a whole, we think, fully warrants the holding of this court that plaintiff was in such a frame of body and mind as not to be in condition to contract and hence that in law he gave no consent it should have the right to withhold out of to the contract claimed by defendant that the compensation due him under the workmen's compensation act the amount of the medical and hospital bills in excess of $250.00.

Delanney vs. Ferd Brenner Lumber Co.

Quave vs. Lott-Batson Lumber Co., hold that hospital and medical bills cannot be deducted by the employer from the compensation due the employee without the latter's consent.

## II.

On the second ground of defendant's application, that the court erred in holding that the plaintiff, as a minor, was incapacitated to give his consent that the excess medical and hospital bills should be paid out of his compensation, defendant calls our attention to subsection 6 of section 3 of the Workmen's Compensation Act which provides that employees of the age of 18 years and upwards shall exercise the right of election or termination or waiver authorized by this section, and insists that it thereby conclusively appears that it was the intention of the legislature to provide that compensation due a minor over the age of eighteen years is to be paid to the minor and that the plaintiff, Lonnie W. Thompson, was fully capable of exercising any right or privilege and of making any agreement with reference to his compensation that an adult would have.

We cannot concur in this view.

Civil Code, 1782, provides:

"All persons have the capacity to contract except those whose incapacity is specially declared by law. These are persons of insane mind, those who are interdicted, minors and married women."

Subsection 6 of Section 3 of the Workmen's Compensation Act cited by defendant, has extended the capacity of minors over the age of 18 years so that they may now elect whether they will come under the operation of the Workmen's Compensation Act; but this section does not go to the extent of giving to minors the right to enter into a contract not expressly contemplated by the Workmen's Compensation Act.

Counsel's argument that if a minor is given the right to determine whether he will come under the operation of the Workmen's Compensation Act he certainly, for the greater reason, has the right to contract with reference to his rights under that Act, is forceful; but the right of minors to contract is fixed by the general law and cannot be extended except by legislative enactment, and the Act relied on by counsel for defendant does not go to the extent of allowing a minor to contract as to rights that have already accrued to him under the Workmen's Compensation law.

### III.

On the third point in defendant's application, that plaintiff's letters indicated that he understood and consented that the excess medical and hospital bills were to come out of his compensation, we have carefully read plaintiff's letters and in our opinion they indicate that plaintiff was homesick, tired of remaining in the hospital and was pleading for money; he practically said in each letter "Please send me a little money".

To our mind, plaintiff's letters indicate that he did not understand any of the arrangements under which he was ·being kept in the Sanitarium. He wrote in one of his letters: "What kind of an arrangement did Mr. Moore make while he was down there?"

From all the letters we think our original holding as to them was correct.

### IV.

As to defendant's fourth contention, that we. were in error in holding that at the date of the trial plaintiff. was totally disabled to do work of any reasonable character and hence entitled to collect compensation during total disability, not to exceed 400 weeks.

Doctor J. C. Willis, Jr., testified on page 2 of the testimony taken by R. T. Russ.

"Q. Doctor, have you had occasion to treat the plaintiff in this case, Lonnie W. Thompson, and if so when and for what condition?
"A. Yes, I first saw him on January 29, 1924. He came into the Sanitarium very emaciated, had bed sores over his back and both hips as big. as saucers and the left leg was amputated above the knee. General condition very poor. He remained under our care, generally improved, slowly improved, very slowly and was operated on again in June, amputation of the stump of the left leg. Discharged September 19, 1924."

Doctor O. C. Rigby testified, page 9:

"A. I would. I don't belive he will ever be able to do manual labor any more.
"Q. You looked at that x-ray plate, did you?
"A Yes.
"Q. Do you agree with Doctor Barrow on what he says?
"A. I do."

On cross examination he testified, page 9:

"Q. Doctor, considering that this man was in a state of emaciated condition for a period of twelve months and that up until some time in July or August, 1924, his life was almost despaired and that after that time he was, you might say, almost nothing but skin and bones, wouldn't that indicate there would be a considerable length of time after he was

able to get up before he would regain the maximum amount of strength that you think he could gain and be a good long time, in other words before he would be able to use himself to any advantage?

"A. Yes, it would be a good long time. I don't believe he will ever be able to use himself to any advantage. The fact that he has a pulse of 140 and a temperature of 100 goes to show that there is still some poison in his system."

Doctor E. L. Sanderson, testified, page 15-16:

"Q. If it is shown that this patient had walked with two crutches under his arms and with the assistance of another man to help him up and down the little rises between here and the Merchants building, what would you say about his likelihood of getting better, knowing the condition as you do?

"A I think he is totally disabled and permanently disabled."

* * *

"A. My opinion is if he was able to walk out of the Sanitarium three or four months ago, that so far as his ability for getting around is concerned, it must have been as good then as it is now because it is about all he can do now to walk out of the Sanitarium."

* * *

(Page 19):

"A. Well, his muscles and his general body tissues have improved, I think, quite rapidly. The thing that doesn't repair is what is known as the parenchymatous tissue. That means that the parenchymatous tissue of the organs, the liver cells is destroyed by septicism, and never repairs. It is replaced by a sort of fibrous tissue, but the other tissue never repairs. The heart tissue that is destroyed by septic poisoning, the tissue is not repaired. The cells of your spleen and different other organs of the body that control the body, these cells are called parenchymatous cells and they are destroyed during infection and they don't repair. They are destroyed forever, and that is the part of the body I don't think the man has any possible chance to ever repair, is the active organs of the body. So far as the other effect on his body he might get just as good as he ever was, and even his muscles, after long exercise, may develop, but the organs of

his body are impaired for all time to come."

Under the above evidence we are forced to our original conclusion that the plaintiff, at the time of the trial, was permanently, totally disabled to do work of any reasonable character.

For the above reasons the application for a rehearing is refused.